NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190784-U

NO. 4-19-0784

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 30, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| TALIA ROSE WALKER, | ) | Appeal from the |
| Petitioner-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DAVID MUSHIMBA, | ) | No. 19OP696 |
| Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's finding of abuse, made pursuant to the Illinois Domestic
Violence Act of 1986, was not against the manifest weight of the evidence.

¶ 2   In November 2019, petitioner, Talia Rose Walker, was granted a plenary order of
protection against respondent, David Mushimba, after the trial court found petitioner had proven
her allegations of abuse by a preponderance of the evidence. Respondent appeals, arguing the
court erred in finding petitioner had proven abuse occurred. We affirm.

¶ 3                              I. BACKGROUND

¶ 4                              A. The Petition

¶ 5   On October 15, 2019, petitioner filed a petition for an emergency order of
protection against respondent. Petitioner alleged she and respondent had dated for approximately

two months and she had ended the relationship in August 2019. Petitioner further alleged that respondent continued to contact her after the relationship ended, even though she had informed respondent that she did not wish to be contacted by him and had blocked his phone number and Facebook account. The trial court granted the emergency order of protection, and a plenary hearing was conducted in November 2019.

¶ 6                                    B. The Plenary Hearing

¶ 7        Both parties appeared *pro se* at the plenary hearing, and they were the only witnesses to testify.

¶ 8                                    1. *Petitioner*

¶ 9        Petitioner testified she "dated [respondent] for a couple of months" until she ended the relationship "[a]round the end of August [2019.]" Petitioner testified she began feeling "uneasy" about respondent's attempts to renew their relationship on September 2, when he "showed up at [her] house uninvited[] and was there for about three hours. He wouldn't leave." Petitioner blocked defendant's phone number and Facebook account, but respondent contacted her through a different Facebook account shortly thereafter. At the beginning of October, respondent sent petitioner two letters "because everything else was blocked." The letters were admitted into evidence. One was titled "Why I was hurt when you dumped me," while the second was titled "What I learned from the woman who got away." In the former letter, respondent writes: "I have tried to send you gifts, friendly conversations, driving to you, pouring my heart out to you, inviting you out to dinner or activity, making you laugh, but you still decided to cut our communication off, you blocked my number and social media."

¶ 10        Petitioner further testified that on October 5, she returned home at approximately 10:30 pm. As she was exiting her vehicle, respondent, who "had parked a few houses down, ***

- 2 -

walked up and scared" her because she "didn't realize it was him ***." Also on October 5, petitioner received a notification that her Firearm Owner's Identification (FOID) card she was expecting had been delivered to her house but it was not in her mailbox. Petitioner suspected respondent may have gone through her mail, so, after being contacted by respondent on October 14 through "a dating app," she unblocked respondent's phone number to "get proof that he had stolen [her] FOID card out of [her] mailbox." The text message exchange was admitted into evidence. Initially, respondent denied having the FOID card. However, later in the conversation, he admitted he had taken the card and told petitioner to "[c]ome get it Wednesday after work. I want a date, hugs and to be unblocked for good." On October 15, petitioner filed a petition for an emergency order of protection because "no matter what [she] did[,]" respondent would not stop contacting her and she feared "it would continue *** and possibly escalate if [she] did not get [an] order of protection."

¶ 11                                2. *Respondent*

¶ 12        Respondent testified that petitioner was his "ex-girlfriend." He stated he continued to contact petitioner after she ended their relationship because when he did so they "ended up having a good conversation" and he believed they "were going in the right direction ***." Respondent stated he contacted petitioner through a second Facebook account in September "to check on her" and because he believed they "could probably get back together at this point." Respondent further testified that in contacting petitioner, he did not "feel like [he] was threatening her or going above and beyond what was acceptable."

¶ 13        Respondent stated that on October 5 he "was in the area" and decided to go to petitioner's house "to surprise [her], just with a visit." When he arrived, he noticed "branches had fallen into her driveway, *** so [he] decided to clean them up while [he] could wait for her

- 3 -

to come home." As he was collecting the branches, he noticed a FOID card "on the ground ***

and, *** not thinking twice about it, [he] just put it in [his] pocket ***." Petitioner arrived at her

house as respondent was "pulling out of a driveway, *** so [he] parked on the side and ***

walked up to her so [they] could *** have a conversation." Respondent stated they "cracked

jokes" and he "could not see her being uneasy." They talked for approximately 30 minutes and

then respondent left. Respondent testified that on October 14 he told petitioner, "I can meet you

and give [the FOID card] to you, we can go on a date if you want, and then if you [do not] want

that ***, I also gave an option for me to put it in the mail." Respondent also admitted he

contacted petitioner on October 14 through "a dating app."

¶ 14                                  3. *The Trial Court's Ruling*

¶ 15          In finding abuse had been proven on the basis of harassment, by a preponderance

of the evidence, the trial court noted that the Illinois Domestic Violence Act of 1986 (Domestic

Violence Act) (750 ILCS 60/101 *et seq.* (West 2018)) was "not designed just to prevent physical

abuse. [It was] designed to prohibit exactly the kind of ongoing, unwanted communication that

was described in this case."

¶ 16          This appeal followed.

¶ 17                                  II. ANALYSIS

¶ 18          On appeal, respondent argues the trial court erred in finding petitioner had been

abused, as that term is defined in the Domestic Violence Act.

¶ 19          As a preliminary matter, we note respondent also argues the trial court erred by

admitting certain hearsay evidence. However, respondent fails to identify the alleged hearsay

evidence in his appellant's brief. Moreover, he has forfeited this argument by failing to object at

the plenary hearing and by failing to cite to the record or to any authority in his brief. *In re Jaber*

*W.*, 344 Ill. App. 3d 250, 256, 799 N.E.2d 835, 840 (2003) (finding the respondent forfeited his hearsay argument by failing to object at trial); Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (requiring that the argument section of an appellant's brief contain "citation of the authorities and the pages of the record relied on"); *People v. Hood*, 210 Ill. App. 3d 743, 746, 569 N.E.2d 228, 230 (1991) ("Contentions supported by some argument but by absolutely no authority do not meet the requirements of [Rule 341(h)(7)]."). Therefore, we will address only respondent's argument related to the court's finding of abuse.

¶ 20        Proceedings to obtain an order of protection are governed by the Domestic Violence Act (750 ILCS 60/101 *et seq.* (West 2018)). The "central inquiry" in such a proceeding is "whether the petitioner has been abused[,]" which involves "an issue of fact that must be proven by a preponderance of the evidence." *Best v. Best*, 223 Ill. 2d 342, 348, 860 N.E.2d 240, 244 (2006). "Abuse" is defined as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty[,] or willful deprivation ***." 750 ILCS 60/103(1) (West 2018). "Harassment," in turn, means "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7).

¶ 21        "A finding of abuse made under the Domestic Violence Act *** will be reversed only if it is against the manifest weight of the evidence[,]" which occurs where "the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best*, 223 Ill. 2d at 350. Given the trial court's superior position to observe the parties and witnesses, "[a] reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id.* at 350-51.

¶ 22        Here, the trial court found petitioner had proven she was abused due to respondent harassing her with "ongoing, unwanted communication ***." We conclude the court's finding of abuse was not against the manifest weight of the evidence.

¶ 23        Petitioner testified that she ended her relationship with respondent "[a]round the end of August [2019.]" Although respondent did not admit to going to petitioner's house on September 2, petitioner testified that he showed up "uninvited" and would not leave for approximately three hours. The trial court apparently found petitioner's testimony credible, and we "will not substitute [our] judgment for that of the trial court regarding the credibility of witnesses[.]" *Id.* Moreover, the undisputed facts demonstrate that, after petitioner blocked respondent's phone number and Facebook account, respondent contacted her through a different Facebook account some time in September. At the beginning of October, respondent sent petitioner two letters and in one of the letters he explicitly acknowledges that petitioner "cut [their] communication off" and "blocked [his] number and social media." On October 5, respondent (1) showed up at petitioner's house uninvited and waited until she returned at 10:30 pm and (2) took her FOID card that had been delivered to her house by mail the same day. Respondent then contacted petitioner again on October 14 through "a dating app." The same day, after petitioner unblocked respondent's phone number to ask respondent about her FOID card, respondent initially denied having the card but later admitted he had it and would return it in exchange for "a date, hugs and to be unblocked for good." Petitioner testified that she feared respondent's conduct would "continue and possibly escalate if [she] did not get [an] order of protection."

¶ 24        Based on this evidence, we cannot say that the court's finding of abuse was unreasonable or arbitrary. See *id.* at 350.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.